IRWIN ET AL. *v.* STATE OF INDIANA.

[No. 27,666. Filed May 28, 1942.]

230

*Robert L. Carrico,* of Indianapolis, for appellants.

*George N. Beamer,* Attorney General, and *Norman E. Duke,* Deputy Attorney General, for the State.

FANSLER, J.—On January 21, 1937, the appellants were charged in the Criminal Court of Marion County with kidnaping a taxicab driver. The records of the court show that they appeared in person and by attorney and entered a plea of guilty upon which they were sentenced to life imprisonment in the Indiana State Prison. In 1941,.more than four years later, they filed their separate petitions, denominated "Verified Petition for Writ of Error Coram Nobis," seeking to have the judgment vacated and their plea of guilty withdrawn, and to be permitted to plead not guilty, and to be put upon trial.

The, petitions, which are substantially identical, and are verified, allege that at the time of the judgment of conviction they were without counsel, had had no opportunity to consult with an attorney, were not advised of their constitutional right to be represented by counsel and to have counsel appointed for them; that they were not informed of, and did not know the character of, the charge against them; that they understood that they were charged with larceny of an automobile, and did not know until after judgment that they were charged with kidnaping; that the trial judge erroneously assumed, and caused the record to show, that they were represented by counsel, and erroneously assumed that they had been advised of, and were familiar with, the charge against them, and that they had understandingly entered a plea of guilty to that charge; that had the trial judge known that they were not represented by counsel, and that they were unfamiliar with the charge against them, he would have advised them of their right to have counsel, and of the character of

the charge against them; and that if so advised they would have plead not guilty to the charge of kidnaping.

It is further alleged in the petitions that the defendants were without funds and have "been under a disability and unable to secure legal assistance up to now in presenting said matters of fact to this (trial) Court; but now through the assistance of fellow inmates he has been able to prepare this petition . . . and he with due diligence does now present said matters of fact occurring at the time of conviction. . . ."

It is further recited that on January 20, 1937, at about 3:00 o'clock in the morning, the petitioners were arrested in the City of Gary, and charged by police officers with the theft of an automobile; that at about 10:00 o'clock p. m., of the same day, they were taken to Indianapolis and confined in jail; that on the morning of January 21st, certain police officers, by the use of forceful and threatening methods, procured the petitioners to sign a typewritten paper, which the officers refused to read to them, or permit them to read; that the officers said: "This is only a statement to show the judge that you have stolen an automobile . . ." and "if you sign this statement we will see that the Judge only gives you One to ten Years"; that the appellant Irwin then requested the police officers to notify his parents, which request was denied; that at about 11:00 o'clock a. m., on January 21st, they were taken, in the custody of three police officers, before the Hon. Frank P. Baker, Judge of the Marion County Criminal Court; that, while in the courtroom, some papers were read, which petitioners did not understand or comprehend; that a man dressed in plain clothes approached the petitioners and asked: "Do you boys have any money?" to which the petitioner Irwin answered "No"; that the man then asked: "Do your people have any

money?"; that the petitioners both answered "No"; that the man then said: "Boys, I am afraid I cannot help you much," and then walked up to the trial judge, and, without further consulting petitioners, said: "Your Honor, these boys plead guilty"; that they were then sentenced to life imprisonment; that, upon being returned to the jail, the petitioner Irwin asked the police officers what the life sentence was for, and was informed that it was for kidnaping; that the petitioners again requested the police officers to notify their parents by telephone or telegram, which requests were again denied; that five days later they were transported to the Indiana State Prison.

It is further alleged that they were of the age of twenty and twenty-two years, respectively, with very little education; that they did not know their constitutional rights at the time of their conviction, and were completely under the influence of the law enforcement officers. It is also alleged that they were innocent of the crime of kidnaping.

When these petitions were filed, petitioners were still without counsel, and counsel was appointed for them by the court. There was a hearing at which evidence was taken. The Hon. Frank P. Baker was no longer judge of the court, and was not called as a witness. There was a new prosecuting attorney, and the prosecuting attorney who had acted in the case was not called as a witness. The record, showing that the petitioners had appeared in person and by attorney and entered a plea of guilty, was introduced in evidence. The name of the attorney appearing for them was not shown. There were no appearance cards in the files, but the clerk testified that the defendants might have been represented by counsel without the files disclosing the fact.

Police officers testified that the appellants were ar-rested in Lake County, at about 2:30 o'clock in the morning of January 20, 1937; that the police officer who arrested them had had a radio call from the city police at Lafayette concerning the theft of an automobile; that they also had information about a taxicab kidnaping charge; that the appellants were taken to Lafayette, and because of motor trouble they did not arrive there until about 8:30 o'clock in the morning. They were questioned in Lafayette. One of the officers said: "The boys told the facts in the case and made a statement in writing at the time and they admitted that they had held up the cab driver here and that they had forced him to drive to Lafayette, and they told about getting a small amount of money from him."

The appellant Irwin testified that they were brought to Indianapolis in the evening of January 20th and placed in jail, and on the morning of the 21st were brought into court; that they had not talked to an attorney, and had no opportunity to talk to any one but the police officers; that he had asked the police to get in touch with his people in Louisville, Kentucky, but that nothing was done about it; that at the time he had $200, which was in his wife's possession; that after he had been questioned a statement was read to him in which something was said about a car theft; that he did not read the statement "because I am not a good reader and I can't read very good"; but that he signed the statement. He said that when they were brought into court there was some talk, and one of the police officers told the judge that the defendants wanted to plead guilty; that the man who told the judge they wanted to plead guilty took them back to jail, and that he believed he was one of the officers; that he was not advised of his constitutional right to a trial by jury,

and counsel, and legal advice; that he saw no attorney and talked with no attorney; that he was not guilty of kidnaping; that he did steal an automobile in Lafayette; that he did not know what was in the signed statement, but that the officer said he had better sign it; that he told him a few of the things that were in it. "He said you beat this cab driver out of some money. And I said well I did beat him out of some money because there was an argument over the money. I paid him the fare after we got to Lafayette and he said all we are going to charge you with will be the car theft. So far as I knew that was what was in that statement that I signed." He testified that he did not remember an indictment being read to him that involved kidnaping; that he did not know he was pleading guilty to kidnaping, or he would not have entered a plea of guilty to that charge.

He testified that his petition was written by a friend in the Indiana State Prison; that he told this friend the story and that he prepared the petition; that the man referred to in the petition as having asked the defendants whether they had money was a police officer, the one that had them in charge.

The appellant Gilliam testified to substantially the same facts. He said that he did not read the statement which he signed, but understood that it concerned the stealing of an automobile, and that he understood he was pleading guilty to the larceny of an automobile. He said that no affidavit or indictment was read to them; that the judge said: "Do you boys wish to plead guilty?" and that they answered "Yes"; that he said: "Do you know what you are pleading guilty to?" and they answered "Yes"; that when the judge asked them if they knew what they were pleading guilty to, he thought the charge was stealing an automobile. He

said they had not consulted with, or been advised by, any attorney at any time; that he was not sure who the man was that questioned them about having money.

There was judgment denying the appellants' petitions, and error assigned questions the correctness of this ruling.

The appellants' petitions for leave to withdraw their pleas of guilty are drafted with considerable skill. Attached to the petitions is an informal but rather exhaustive brief with much citation of authority. The person preparing the petitions, while apparently not a practicing attorney, obviously has a considerable knowledge of the branch of the law involved.

Section 13 of Article 1 of the Constitution of Indiana provides: "In all criminal prosecutions, the accused shall have the right to a public trial, by an impartial jury, in the county in which the offense shall have been committed; to be heard by himself and counsel; to demand the nature and cause of the accusation against him, and to have a copy thereof; to meet the witnesses face to face, and to have compulsory process for obtaining witnesses in his favor." These constitutional rights may be waived, but the waiver must be made freely and understandingly, and unless they are so waived there is error in the proceeding. Where a defendant is represented by competent counsel, a failure to assert or claim constitutional rights is treated as a waiver, but where a defendant is not represented by counsel, the mere failure to assert or insist upon a constitutional right is not of itself sufficient to establish a waiver. When a defendant has been sentenced for a crime upon a plea of guilty without having been accorded his constitutional rights, it will be assumed that the trial court was mistaken in the facts, since it cannot be conceived that, knowing the facts,

the court would have proceeded to judgment. *Sanders v. State* (1882), 85 Ind. 318. At common law such an error of fact was corrected by a writ of error *coram nobis*, and the procedure for correcting the error in this State, and in many of the states, is generally described as a *coram nobis* proceeding, although the common-law scope of this procedure is necessarily much curtailed. Citing the Sanders case, *supra*, and cases from many other jurisdictions, the Court of Appeals of California, in *People* v. *Vernon* (1935), 9 Cal. App. (2d) 138, 141, 49 P. (2d) 326, 327, said: ". . . it is manifest that that which remains of the relief which ordinarily was available as part of the original common-law remedy of 'writ of error, *coram nobis*' is made equally available, not necessarily, as formerly, by the issuance of the *writ*, but simply by the legal machinery attendant upon a motion to vacate the judgment. It therefore results that, although the relief sought be of the nature of that included within and formerly afforded by a writ of error, *coram nobis*,—because of its comparatively ancient origin and its correspondingly relatively recent disuse, the mystery and the magic which now apparently attach to such an appellation as applied to the proposed remedy are completely dispelled and obliterated by designating such remedy by the more simple and appropriate name of a motion to vacate the judgment. The practical result of such practice in effect and substance demonstrates that the relief that may be administered by the one form of procedure is identical with that in the other."

A judgment rendered under a mistake in fact is not void and cannot be collaterally attacked. The petition must be filed in the court in which the judgment was rendered, and, whether it be designated a petition for a writ of error *coram nobis* or a

motion to vacate the judgment, the right to relief will be determined from the facts alleged and proven. ". . . the relief that may be administered by the one form of procedure is identical with that in the other."

Where there has been a trial, the object of the proceeding is to procure a new trial. Where there has been a plea of guilty and no trial, the object is the withdrawal of the plea so that a plea of not guilty may be entered and a trial may be had. A judgment has been said to be a judicial contract, and where a judgment has been entered upon a plea of guilty the contract is by agreement. If a contract is entered into under a mistake of fact, it is not void, but may be rescinded upon discovery and establishment of the mistake, but it is universally held that the party seeking to avoid the contract must be diligent in discovering and asserting the mistake and in seeking relief, and that, where he has knowledge of facts sufficient to put him upon inquiry, he is chargeable with knowledge of all matters which he could have learned by reasonable inquiry.

.The following are all of the cases that we have found which deal with the question of the time within which a petition to vacate a judgment by proceedings in the nature of *coram nobis* may be filed: *People* v. *Kelly* (1939), 35 Cal. App. (2d) 571, 96 P. (2d) 372; *People* v. *Lumbley* (1937), 8 Cal. (2d) 752, 68 P. (2d) 354; *People* v. *Vernon, supra; People* v. *Black* (1931), 114 Cal. App. 468, 300 P. 43; *In re Ernst* (1923), 179 Wis. 646, 192 N. W. 65; *Dobbs et al.* v. *State* (1901), 63 Kan. 321, 65 P. 658; *State* v. *Calhoun* (1893), 50 Kan. 523, 534, 32 P. 38. The courts of California require due diligence in presenting the petition. The language of the Kansas opinions indicates that the court believes such a rule desirable, but it was

concluded that the "disability" statute, which included persons in prison, exempted prisoners from the requirement of showing diligence during the time of imprisonment. The Supreme Court of Wisconsin entertained an original action to revoke a judgment of the Municipal Court of Milwaukee County entered upon a plea of guilty alleged to have been procured by fraud upon a defendant who did not understand English. The court denied jurisdiction and said that the remedy was in the trial court. It is assumed that what was said beyond this is *obiter dictum*. It is said in the opinion that no statute which would bar the action exists, and that "no valid judgment or sentence" had been pronounced. But it is assumed that this was not intended to mean that the judgment was void, since it is also said that if the writ is not available there is no relief to be had in the judicial system of the State. If the judgment was void, relief might have been had by *habeas corpus*. Whether the fraud involved was constructive, arising out of a mistake or misunderstanding, or active fraud, does not appear, nor is it clear that it would make any difference. The court seems to have considered only statutory limitations. Perhaps the requirement of diligence as a condition to relief from judgments entered under a mistake of fact was not considered. The reasons which support the rule requiring diligence in the case of contracts and civil judgments apply with equal force in criminal cases. The State must assert its cause of action against the defendant within a limited time; and after judgment, especially upon a plea of guilty, it has a right to assume that the transaction is closed and settled, and to rely upon finality of the judgment. There is no apparent reason for longer preserving evidence and keeping con-

tact with witnesses. Law enforcement and judicial officers change, and the State is put to a disadvantage if an unexpected trial should be made necessary. These considerations should not in justice cause a disadvantage to the judgment defendant until he has knowledge of the facts and a reasonable opportunity to seek relief, but if he should thereafter willfully delay the assertion of his rights to the further disadvantage of the State, and to his own advantage, the result may often be not the granting of a trial to the defendant, but the practical denial of an opportunity for the State to prosecute its action.

Where a defendant has entered a plea of guilty, the ostensible purpose of the writ is to procure a withdrawal of the plea and a trial, but if one sentenced to life imprisonment may be permitted to wait perhaps many years without excuse before filing his petition to withdraw the plea, the result may be, and probably will be, that he will escape trial entirely because of the inability of the State to gather the witnesses and produce the evidence of his guilt. See 22 C. J. S., Criminal Law, § 421; *Hubbell* v. *State* (1930), 41 Wyo. 275, 285 P. 153; *Clark v. State* (1895), 57 N. J. L. 489, 31 A. 979; *Hodge* v. *State* (1892), 29 Fla. 500, 10 So. 556; *Territory of New Mexico* v. *Cook* (1893), 7 N. M. 248, 33 P. 1022; *United States* v. *Bayaud et al.* (1883), 23 F. 721; *Dobosky* v. *State* (1915), 183 Ind. 488, 109 N. E. 742. It is said by the Supreme Court of Kansas in *Dobbs et al.* v. *State, supra* (page 326 of 63 Kan., page 660 of 65 P.) : "When time had removed or so scattered the witnesses of the prosecution, or the memory of those who could be obtained had grown dim, a writ of *coram nobis* would result in certain acquittal."

That the drafter of appellants' petitions thought it

necessary to allege and prove diligence is evidenced by the allegation: "That your petitioner having been without funds has been under a disability and unable to secure legal assistance up to now in presenting said matters of fact to this Court; but now through the assistance of fellow inmates he has been able to prepare this petition for a Writ of Error Coram Nobis and he with due diligence does now present said matters of fact occurring at the time of conviction. . . ." These petitions are verified, and, under the general rule pertaining to motions based upon facts dehors the record, they may be considered as evidence in so far as they consist of evidentiary facts, but the mere verification of a statement of an ultimate fact, which must be determined by the trior of the facts, cannot be considered evidence of the fact to be established unless perhaps in the case of a negative. So the mere verified assertion that the appellants acted with due diligence is not evidence of the fact.

It is asserted that until the time of preparing and filing the petitions, the petitioners have been without funds, but it is disclosed by their testimony that the petitioner Irwin had $200 at the time of his arrest; that this money was in the possession of his wife; and that his people knew of his incarceration within two weeks after the judgment. The petitioners asserted that they were not advised of the nature of the accusation against them; that they did not know they were charged with kidnaping at the time they entered the plea, but they testified that they inquired immediately upon being returned to the jail as to why they had been sentenced to life imprisonment, and were then advised that they had been charged with and convicted of kidnaping and had been sentenced to life imprisonment for that offense. There is no

evidence that they were not visited by their people and friends, or that they were prevented from communicating with them, nor does Irwin explain why he did not have access to his money, which was in his wife's possession. It is commonly known that prisoners in the state prison have the privilege of writing letters and communicating with their families and friends and with courts and public agencies, and that they have the privilege of receiving visitors on stated occasions. It is true that there is no evidence that they were advised of their right to have counsel appointed by the court, and it may be concluded that the trial judge mistakingly believed that they were represented by counsel when they were not, but it is clear that both appellants knew immediately after the judgment of conviction that they had been sentenced to life imprisonment for kidnaping. It does not appear that they asked to be taken back into court or that they made any effort whatever to advise the trial court, or the prosecuting attorney, or their families, or friends that they had not intended to plead guilty to kidnaping, and that they did not know when put upon their plea that they were charged with kidnaping, nor is there evidence of facts which would tend to explain or excuse their failure to act for more than four years. It is true that there is evidence that the appellants had very little education, but they were adults and are chargeable with the burden of exercising such diligence as might be reasonably expected from one in their condition under the same circumstances and surroundings.

Since this is not an original action, we are not concerned with the limitations upon the beginning of actions. We are concerned with the time in which judgments, final on their face, may be vacated and set aside. Generally courts have no

jurisdiction to vacate judgments after the term at which they are rendered, and it was thought necessary in our civil code to make express provision for relief against judgments taken through mistake, inadvertence, surprise, or excusable neglect, and it was provided that the court might relieve a party under such circumstances within two years after judgment. § 2-1068, Burns' 1933, § 173, Baldwin's 1934. But it is settled that, notwithstanding two years were allowed by statute, the applicant is not excused from showing that he has acted promptly and diligently, and in the absence of such a showing he is denied the relief even within the two-year period. *Birch* v. *Frantz* (1881), 77 Ind. 199; *Ammerman* v. *State ex rel. Wasson, Auditor* (1884), 98 Ind. 165; *Moore* v. *Horner* (1896), 146 Ind. 287, 45 N. E. 341. There is no provision for relief from judgments after term in our criminal code. Perhaps it was thought unnecessary in view of the fact that the executive may grant relief by an exercise of the power of commutation or pardon. There is no such power to relieve against unjust or unconscionable civil judgments. The right to relief from criminal judgments entered through error of fact was found by the courts in the common law notwithstanding the code. Courts of equity have assumed the right to grant relief in certain cases after the expiration of statutory limitations, but under all of the authorities diligence has been required as a condition to relief; laches is a bar. And, as we have seen, even where a statute authorized relief under our civil code, this court, for the protection of the finality of judgments, required diligence notwithstanding the statute.

All limitation upon the assertion of rights or the granting of remedies is based upon sound public policy,

the reasons for which need no elaboration, and the reasons apply to and are the basis for the court-made requirement of diligence in seeking relief against final judgments as well as the arbitrary statutory limitation upon the bringing of actions, both civil and criminal. These limitations operate upon just and unjust claims alike. It has been thought necessary to deny the right to the assertion of even just claims in order that there may be finality and repose. It has not been supposed that the machinery of human justice can operate with perfection and exactness. The common law did not authorize a new trial for errors of law. The remedy was a recommendation to pardon, signed by the judges, and this was granted as a matter of course. See *Sanders* v. *State, supra.* We have remedied that, but the statutory right to the remedy of appeal for the correction of errors is limited in time. The necessity for such a limitation in the public interest is everywhere recognized and conceded. This same necessity requires some limitation upon the common-law remedy for the correction of errors of fact, and it is found in a reasonable and flexible requirement of diligence. The arbitrary statutory time limitation works less hardship upon the enlightened, the able, and the alert, but it has been thought justified, none the less. The judicial limitation involved in the requirement of diligence is more liberal and takes into consideration the condition of the party and the surrounding circumstances, and leaves the determination of the question of whether diligence has been established to the sound discretion of the trial court.

It is alleged in the petitions that the appellants had been under a disability. It is possible that this allega-

tion was suggested by the opinion in *State* v. ▆▆▆ *Calhoun, supra,* in which it was held that, because of the fact that by statute persons in prison were under legal disability, there was no limitation upon the time within which a prisoner might institute a proceeding to set aside the judgment of conviction against him. By § 2-4701, Burns' 1933, § 1217, Baldwin's 1934, a part of our civil code, it is provided that: "The phrase 'under legal disabilities' includes persons within the age of twenty-one [21] years, or of unsound mind, or imprisoned in the state prison, or out of the United States." There is also a provision in the criminal code that: "In all cases where no special provision has been made in this act, the rules of pleading and practice in civil actions shall govern, so far as applicable." § 9-2407, Burns' 1933, § 2395, Baldwin's 1934. But it may well be doubted whether a statute placing certain classes under legal disabilities is a rule of pleading and practice. It is rather a law affecting substantive rights. By uniform and accepted practice in this State from the beginning, criminal actions have been prosecuted against persons under the age of twenty-one years, and such persons have appeared and defended in their own name, and not by guardian or committee or next friend, and they have filed motions for new trial and prosecuted appeals in their own name. At common law, persons under the age of twenty-one, but who had reached an age at which it was considered that they understood the difference between right and wrong, were treated as adults in criminal proceedings. It has been the uniform and accepted practice to prosecute prisoners in the state prison for violations of the criminal law committed during imprisonment, and they are permitted to appear without guardian or committee, and in the instant case, in conformity to the long-

accepted practice, prisoners in the state prison have been considered as not under a disability which prevents them from pursuing their remedy for relief from a criminal judgment against them. Statements in the cases to the effect that proceedings such as this are civil do not mean that they are original civil actions, but only refer to the rules of pleading and evidence by which they are governed. It may be that in jurisdictions where the judgment is considered void, and an action may be maintained in any court of competent jurisdiction for a declaration that it is void, the proceeding may in fact be a civil action. But we have uniformly held that the judgment is not void, and that jurisdiction to set it aside rests only in the court that entered the judgment. The proceeding is in fact, as pointed out by the California court, a motion to vacate the judgment, addressed to the court that entered the judgment, and the proceeding is a part of the criminal action in which the judgment was entered. We have in this State criminal courts with no civil jurisdiction whatever. Nevertheless they, and they alone, have jurisdiction to vacate their own judgments. As a further indication that the disability provisions of the civil code were not intended to apply to criminal procedure, it is noticed that there is an express provision against the prosecution of a person of unsound mind until such time as it is ascertained that sanity has been restored. This would be unnecessary if the disability statute applies. There is no such provision as to minors or prisoners. Under a former statute, married women were under disability, but they were proceeded against in criminal actions, defended in their own name, prosecuted appeals, and were treated in all respects as though they were not under disability. Under our civil practice, an action may be maintained against an infant,

for whom a guardian *ad litem* will be appointed, and a judgment may be taken. The infant may appeal from the judgment within the statutory period after arriving at full age, but it has never been thought that an infant who is convicted of crime may appeal from the judgment within the statutory period after he arrives at maturity.

It is concluded that the disability provisions of the civil code do not affect the time limitation upon ▆ proceedings to vacate judgments in criminal cases.

Diligence is a question of fact. We have carefully reviewed the evidence, and the lack of evidence, of diligence, and have concluded that it is such that ▆ the trial court was justified in denying relief because of the lack of diligence. Having reached this conclusion, it is unnecessary for us to pass upon the sufficiency of the evidence on the merits.

Judgment affirmed.

NOTE.—Reported in 41 N. E. (2d) 809.